## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM I. BABCHUK, M.D. and WILLIAM I. BABCHUK, M.D., P.C. d/b/a COMPREHENSIVE MEDICAL IMAGING, | ) ) ) ) ) ) |  Civil No. 1:13-cv-1376 |
|       Plaintiffs, | |
| v. | |
| INDIANA UNIVERSITY HEALTH, INC., INDIANA UNIVERSITY HEALTH TIPTON HOSPITAL, INC., MICHAEL L. HARLOWE, JOELLEN SCOTT, CARL M. PAFFORD, DIANNA ANDREWS, and KEVIN W. CONDICT, MICHAEL E. HARPER, and RICHARD J. YOUNG, | |
|       Defendants. | |

**COMPLAINT**

**Deprivation of Constitutional Rights
Under 42 U.S.C. § 1983**

**Demand for Jury Trial**

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiffs, William I. Babchuk, M.D. and William I. Babchuk, M.D., P.C. d/b/a Comprehensive Medical Imaging (collectively "Plaintiffs"), for their causes of action and claims for relief allege:

### NATURE OF THE CASE

1.    This is a 42 U.S.C. § 1983 action brought by William I. Babchuk, M.D., a board certified radiologist since 1988 (individually Plaintiff or Dr. Babchuk), and William I. Babchuk, M.D., P.C. d/b/a Comprehensive Medical Imaging against persons, acting under the color of law, who wrongfully deprived Plaintiffs of their constitutionally protected clinical practice privileges without due process thereby depriving Dr. Babchuk

of his clean, unblemished medical license and his livelihood.   Plaintiffs seek compensatory, special and punitive damages against the corporate defendants and each individual defendant.

2.      The substance of Plaintiffs' claim arises from the June 26, 2012 summary suspension of Plaintiffs' hospital clinical privileges and the summary termination of Plaintiffs' contract with the hospital to practice radiology.   The Defendants' reports of Plaintiffs' summary suspension to the National Practitioner Data Bank and to the Office of the Indiana Attorney General Licensing Enforcement Unit contained false information and each of the Defendants knew the information was false when they submitted the reports.   The conduct of each Defendant falls outside the protective scope of Indiana and federal statutory peer review schemes.

## PARTIES

3.      Plaintiff is a medical doctor and has been a board certified radiologist in diagnostic radiology since 1988.   Plaintiff has been an active member of the Defendant hospital's medical staff since March 2003.    Plaintiff, through his corporation, Comprehensive Medical Imaging, entered into an Agreement with Defendant, Indiana University Health Tipton Hospital, Inc. (hospital) to supply the hospital with radiology services commencing in September 2008.   The initial term of the Agreement was for five (5) years through September 4, 2013.   Thereafter, the Agreement would automatically renew for successive one year terms.   Plaintiff intended to practice for another 10 years at the hospital.

4.      Indiana University Health, Inc. is a non-profit corporation (I.U. Health) formed and controlled by the trustees of Indiana University.  I.U. Health is the sole member (owner) of the hospital.  I.U. Health appoints the members of the hospital's governing Board of Directors.  I.U. Health also appoints the hospital's CEO and President, who is paid by I.U. Health, not the hospital.

5.      The defendant hospital is a 501(c)(3) non-profit corporation and is owned by Indiana University Health, Inc.  The hospital is a public hospital.  The hospital is regulated by the Indiana State Department of Licensing.  The hospital is governed by its Board of Directors, which is responsible for the assignment of clinical privileges to medical staff.  The hospital's Board of Directors is responsible for the summary suspension of medical staff and submittal of written reports concerning discipline of its medical staff to the Indiana Medical Licensing Board and the National Practitioner Data Bank.  The hospital has an established Peer Review Committee charged with the responsibility to evaluate patient care rendered by credentialed, medical staff granted clinical privileges at the hospital.

6.      Defendant, Michael L. Harlowe (Harlowe), at all relevant times was the President and CEO of the hospital.  Harlowe is not employed by the hospital.  Instead, Harlowe is an employee of I.U. Health, the hospital's owner.  Harlowe was also a member of the hospital's Medical Executive Committee (MEC) and Patient Care Review Committee (PCRC).  Harlowe, individually and in concert with others, wrongfully terminated Plaintiffs' radiology service contract based on Harlowe's summary suspension of Plaintiff's hospital clinical privileges before Plaintiff was allowed a fair hearing and

long before the hospital's governing Board of Directors could make a final decision on Harlowe's recommendations to summarily suspend Plaintiff's hospital clinical privileges.

7.      Defendant, Joellen Scott (Scott), at all relevant times was the Vice President of Patient Care Services at the hospital.  Scott was also an ex-officio member of the MEC.  Scott individually made a "peer review" recommendation that Plaintiff's hospital privileges be summarily suspended before Scott conducted an evaluation and investigation into whether the complained of conduct was based on the actual competence of Plaintiff and whether his conduct adversely affected the health or welfare of a patient.

8.      Defendant, Carl M. Pafford (Pafford), at all relevant times was a member and the Chairman of the (PCRC) and the MEC.  Pafford was also the hospital's Chief Medical Officer.    Members of statutorily sanctioned peer review committees are prohibited by Indiana law from revealing to anyone outside the Peer Review Committee, communications or determinations made by the Peer Review Committee.  Pafford, individually and in concert with other Defendants, imposed the sanction of summary suspension of clinical privileges against Plaintiff before Plaintiff was given notice of the charges and the opportunity of a timely and fair hearing.

9.      Defendant, Dianna Andrews (Andrews), at all relevant times was Chief of the Medical Staff at the hospital.  Andrews was also the Chairman of the MEC and a member of the PCRC.  Andrews, individually and in concert with other Defendants, imposed the sanction of summary suspension against Plaintiff before Plaintiff was given notice of the charges and the opportunity of a timely and fair hearing.  Andrews voted to

4

summarily suspend Plaintiff's clinical privileges even though she never investigated the matter.

10.     Defendant, Kevin W. Condict (Condict), at all relevant times was a member of the PCRC and the MEC.  Condict, individually and in concert with other Defendants, imposed the permanent sanction of summary suspension against Plaintiff before Plaintiff was given notice of the charges and the opportunity of a timely and fair hearing.

11.     Defendant, Michael E. Harper (Harper), at all relevant times was a member of the MEC.  Harper was also chairman of the hospital's Credentials Committee.  Harper, individually and in concert with other Defendants, imposed the permanent sanction of summary suspension against Plaintiff before Plaintiff was given notice of the charges and the opportunity of a timely and fair hearing.

12.     Defendant, Richard J. Young (Young), at all relevant times was the hospital's Director of Quality Assurance and a member of both the MEC and the PCRC. Young, individually and in concert with other Defendants, imposed the permanent sanction of summary suspension against Plaintiff before Plaintiff was given notice of the charges and the opportunity of a timely and fair hearing.

13.     Each of the individually-named defendants played a knowing and influential role in the wrongful summary suspension of Plaintiff's clinical hospital privileges, the wrongful tarnishment of Plaintiff's medical license, the destruction of Plaintiff's reputation as a quality physician and Plaintiff's ability to make a living.  The summary suspension of Plaintiff's clinical privileges by Defendants precludes Plaintiff, in the future, from denying he committed a wrong.  Each individual Defendant, Harlowe,

Scott, Pafford, Andrews, Condict, Harper and Young, together with the hospital and I.U. Health were motivated by evil intent and reckless or callous indifference to Plaintiff's constitutionally protected property rights. The conduct of each Defendant gives rise to imposition of punitive damages against each defendant.

14.     All of the acts, omissions and conduct alleged herein by each of the individual Defendants were within the course and scope of their employment with the hospital and I.U. Health. The acts, omissions and conduct of the individual Defendants was approved and encouraged by I.U. Health and the hospital in furtherance of their business strategy for the hospital and I.U. Health.

## JURISDICTION

15.     This court has jurisdiction over this pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331; 28 U.S.C. § 1343; and 42 U.S.C. § 1988.

16.     In 1986, Congress adopted the Health Care Quality Improvement Act. See 42 U.S.C. § 11101 *et seq*. This act recognizes that clinical privileges granted to physicians by hospitals are protected property rights that cannot be taken away or tarnished without constitutionally protected due process of law. Indiana has a similar statutory scheme whereby peer review committees are established to evaluate patient care rendered by credentialed hospital medical providers. I.C. 34-6-2-99. Professional review actions taken by peer review committees are actions or recommendations which must be based on the competence or professional conduct of a medical staff member, which conduct would adversely affect the health or welfare of a patient.

17.     Before any adverse peer review action can be taken against a credentialed professional provider at the hospital, the provider must be offered the opportunity to appear before the peer review committee to hear the charges, offer rebuttal and be given the opportunity of a timely and fair evidentiary hearing. *E.g.*, I.C. 34-30-15-4 and 5.

18.     The constitutional right to a timely and fair hearing protects Plaintiff's livelihood.   Without a timely and fair hearing, the livelihood of any credentialed physician with clinical privileges is exposed to anyone who has a reason and the wherewithal to destroy it, which is exactly what happened in this case.   Plaintiff was wrongfully deprived of his state and federally created right to a timely and fair hearing (i) before the defendants summarily suspended his clinical privileges; (ii) before Defendants terminated Plaintiffs' employment Agreement; (iii) before the PCRC and the MEC recommended summary suspension of Plaintiff's clinical privileges; (iv) before Defendants reported the summary suspension to the NPDB; and (v) the Office of the Indiana Attorney General Licensing Enforcement Unit.

19.     Plaintiff's constitutionally protected property interest in his medical privileges granted by the hospital was taken without due process of law.

<b><u>FACTS AND RELEVANT EVENTS</u></b>

**A.**     <b><u>Dr. Babchuk's Hospital Privileges</u></b>.

20.     Plaintiff was awarded clinical privileges at the hospital in 2003.   The hospital's Medical Staff Bylaws requires re-credentialing of all physicians every two years.   Plaintiff's most recent re-credentialing was in June 2011.   At all relevant times,

Plaintiff was in "good standing" regarding his medical staff appointment and clinical privileges at the hospital.

21.     The hospital's Medical Staff Bylaws qualifications expressly provide that all physicians must possess an unlimited clean, unblemished license to practice medicine in the State of Indiana.  All physicians including Plaintiff must document their "good reputation" in the medical community in order to be extended privileges to practice at the hospital.  Plaintiff met all of these qualifications.  Plaintiff was also the hospital's Director of Radiology.

22.     The hospital employed both staff and contracted physicians.  Plaintiff was a contracted physician.   Under his contract, Plaintiff was required to maintain staff privileges and abide by the hospital Medical Staff Bylaws.  Plaintiff's clinical privileges were consistently renewed by the hospital and his medical license was clean and blemish free.

**B.**     **Events Between June 11 and June 19, 2012**.

23.     On the morning of June 11, 2012, a patient presented at the hospital to receive an ultrasound, which was performed by hospital radiology staff.  Plaintiff read the ultrasound, consulted with the patient's treating physician and dictated his report into the hospital records system.

24.     Later that day, the same patient experienced complications and returned to the hospital through its emergency department.  The emergency department physician ordered a second pregnancy ultrasound, which was performed by the hospital's radiology staff.  Within minutes, Plaintiff read the radiology study, reviewed the film and consulted

with the patient's ER doctor that ordered the radiology ultrasound.   After the consultation, the patient was discharged and transferred to another hospital facility.

25.    Both of the patient's ultrasound images were put on a disc and sent with the patient at the time the patient was discharged and transferred to another hospital facility. The Plaintiff dictated his report on the second ultrasound on June 19th and electronically signed it June 20, 2012.

26.    Between June 12 and June 19, the hospital's radiology technician, who conducted the second study, asked Plaintiff to dictate a final report.  She explained to Plaintiff that the patient had no insurance but that the hospital was billing the patient for two ultrasounds.  Plaintiff expressed concern that it made no sense to require the patient to pay for two ultrasounds.  Plaintiff told the technician to make it go away.  Later, the technician stated that it was her belief that Plaintiff wanted her to delete the patient's second ultrasound from the hospital system.

27.    The hospital's radiology scheduler contacted Plaintiff on June 12, 2012 regarding the dictation report for the second ultrasound.  Plaintiff stated that he would get to it later.  Plaintiff a few days later indicated to the radiology scheduler to just make it go away.  The hospital radiology scheduler reported this incident to the hospital's radiology manager.

28.    It is undisputed that Plaintiff never directed any staff person at the hospital to "destroy or delete the ultrasound study from the medical record."

C.    **Events Between June 20 and June 26, 2012.**

29.    On June 20, 2012, at the insistence of the hospital's radiology manager, the radiology scheduler and the radiology technician each filed separate written complaints against Plaintiff alleging inappropriate conduct based on their conversations with Plaintiff regarding Plaintiff's statement to "make it go away."

30.    On June 20, 2012, the following actions were taken against Plaintiff based on the hospital's concept of "peer review":

(a)    Pafford was informed of the two complaints against Plaintiff by both Young and Scott.  Pafford orchestrated an immediate meeting with them and the manager of radiology (the person who told the hospital's radiology technician and radiology scheduler to file written complaints against Plaintiff) to devise a methodology to summarily suspend Plaintiff's clinical privileges.  Pafford contacted Andrews to advise her that Scott would prepare a written corrective action request against Plaintiff and would send it to her.  Pafford told Andrews to, in turn, prepare a written request for peer review, sent it to Harlowe demanding an ad hoc committee of Andrews, Pafford, Harlowe, and Harper summarily suspend Plaintiff's clinical privileges.

(b)    Scott, the hospital's Vice President of Patient Care Services, with the help of Pafford and hospital lawyers, created and submitted a written "peer review Request for Corrective Action" concerning the Plaintiff.  Scott's written request for Corrective Action was sent to Andrews, the hospital's Chief of Staff and a copy was also sent to all members of the MEC (individual defendants).  Scott explained that the grounds for the peer review corrective action involved "specific care and treatment to a patient

who presented to the Emergency Department on June 11, 2012." Scott specifically referenced the reports from the radiology scheduler and radiology technician that Plaintiff stated the patient's second ultrasound "should just go away."

(c)     Upon receipt of Scott's written request, Andrews (as instructed by Pafford) immediately created and submitted her own written "peer review Request for Corrective Action" and sent it to Harlowe, the hospital's President and CEO. Andrews also sent a copy of her "peer review" memorandum to all members of the MEC. As a "peer review" sanction, Andrews recommended that "we exercise the . . . summary suspension of medical staff against" Plaintiff. Andrews stated that immediate action "would be in the best interest of patient care and that "summary suspension is warranted in this case." Andrews stated that she already conspired with the Chairman of the Patient Care Review Committee (Defendant Pafford) and indicated he had already coordinated coverage for the summary suspension of the Plaintiff's privileges to practice at the hospital. Andrews further stated that the Patient Care Review Committee (PCRC) could merely act as an ad hoc investigative committee to convene and recommend immediate summary suspension of Plaintiff.

31.     The hospital's Medical Staff Bylaws authorize the summary suspension of hospital privileges only when there is an imminent danger to the life, health or safety of a patient. When such a situation arises, the hospital's Medical Chief of Staff serves "as a peer review committee" by herself.

32.     Based solely on the complaints of two non-medical personnel, on June 20, 2012, Andrews, acting as the hospital's "peer review committee," recommended

summary suspension of Plaintiff.  The Chairman of the PCRC, Pafford, accepted the recommendation without any investigation.

33.     On Friday, June 21, 2012, Pafford, by telephone, contacted Harlowe, Harper and Andrews to accumulate the four votes Pafford needed to summarily suspend the Plaintiff from his hospital clinical privileges.  Although Pafford collected his four votes, Pafford first needed to ensure the hospital had adequate radiology coverage. Pafford could not arrange for radiology coverage until June 26, 2012.  Notwithstanding the four votes for "summary suspension," during this five day period, the hospital continued to allow Plaintiff to perform his radiology services at the hospital.

34.     After adequate radiology coverage was secured, on June 26, 2012, the hospital's CEO, Harlowe and the hospital's Chief Medical Officer, Andrews, met with Plaintiff and informed Plaintiff that his privileges to practice at the hospital were summarily suspended.  This was Plaintiff's first indication that any "peer review" disciplinary actions were being taken against him.

35.     The same day, June 26, 2012, Harlowe and Pafford prepared, executed and hand delivered a certified letter to Plaintiff stating that Plaintiff could no longer practice at the hospital, a copy of that letter was sent to Andrews.  Plaintiff was unceremoniously kicked out of the hospital.

36.     The next morning, the hospital's CEO Harlowe, under the guise of "peer review," delivered a letter to Plaintiff notifying Plaintiff that Plaintiffs' contract to supply imaging services to the hospital was terminated retroactive to June 26, 2012.  Harlowe chastised Plaintiff for taking more than eight (8) days to dictate a report on the second

ultrasound which occurred June 11, 2012.  A copy of the termination letter was sent to Andrews, the hospital's Chief of Staff.

**D.** **Defendants' Conduct—Pretext of Peer Review**.

37.   Defendants purport to have peer review procedures in place and operate under Indiana's peer review committee statutory scheme and under the authority of and in compliance with the Health Care Quality Improvement Act.

38.   Before Plaintiff could protect his constitutionally protected property rights in his clinical privileges and his blemish-free medical license, Defendants had engaged in six (6) acts of negative "peer review corrective action" against Plaintiff without giving the Plaintiff any notification of the charges and without Plaintiff being given a timely and fair evidentiary hearing.  Defendants had no reasonable basis to conclude the Plaintiff posed an imminent threat to patient safety that would, under these circumstances, justify summary suspension of Plaintiff's privileges to practice medicine at the hospital.

39.   On June 28, 2012, only 36 hours after receiving notice of the summary suspension, Plaintiff was ordered to appear before the PCRC, which included as its members Pafford, Andrews, Condict, Young and Harlowe.  At no time prior to the meeting of the PCRC, was Plaintiff provided the details of the allegations or a list of the witnesses who would be testifying.  During the meeting of the PCRC, Plaintiff was (i) required to testify prior to the testimony of the accusers, (ii) prohibited from being present during the PCRC's questioning of the accusers, and (iii) denied the opportunity to respond to the accuser's testimony before the PCRC voted to continue the summary suspension.

13

40.     Three days later, on July 2, 2012, Andrews convened a special meeting of the hospital's MEC.  Pafford acted as Andrew's "surrogate or her advocate" as he described it when he took over the MEC meeting.  Pafford explained to the MEC that the Committee should accept the recommendation of his PCRC to continue the summary suspension of Plaintiff's privileges at the hospital.  Four of the members of the MEC who voted for summary suspension were the same members of the PCRC that voted for summary suspension.  Pafford and Harlowe had already terminated Plaintiff's physician contract with the hospital effective June 26, 2012.

41.     By letter dated July 5, 2012, the MEC notified Plaintiff of the MEC's "peer review" discipline to maintain the summary suspension of Plaintiff's clinical privileges and responsibilities at the hospital stating that "this action is being taken to protect the life, health, safety and well-being of patients."  Defendants had no reasonable bases to conclude Plaintiff posed a threat to the life, health and safety of hospital patients.  Defendants knew there was no imminent danger to the life, health or safety of the ultrasound patient, who was transferred to another hospital facility on June 11, 2012.

42.     Defendants' imposition of the "peer review" sanctions of summary suspension of privileges and the unilateral termination of Plaintiff's service contract with the hospital were instituted without the reasonable belief that their actions were warranted by the facts after a reasonable effort to obtain the facts and after adequate notice to Plaintiff of the charges and the opportunity for a timely and fair hearing.  The conduct of Defendants in taking Plaintiff's property rights in clinical privileges and his unblemished medical license violates 42 U.S.C. § 1983 and is wholly outside the scope of any

14

protections that may have otherwise applied under the Health Care Quality Improvement Act and the Indiana peer review statutory scheme.

43.     Pafford and Harlowe knew the outcome of the July 2, 2012 MEC meeting before the meeting.   On or about June 29, 2012, Pafford violated the confidentiality requirements of the PCRC and state and federal statutory schemes.   Pafford met with a non-PCRC medical staff person and told that person that Plaintiff would "not be coming back to I.U. Health."

44.     On August 2, 2012, the hospital submitted a report on Plaintiff's summary suspension to the National Practitioners Data Bank explaining that Plaintiff's clinical privileges had been summarily suspended because of "conduct evidencing unethical unfitness and failure to provide medically reasonable and/or necessary items or services." The hospital's report to the National Practitioners Data Bank stated that Plaintiff "failed to read a radiology study and dictate a report.  After a period of eight days and multiple requests by hospital staff the report was read and a dictation was created."  The hospital went on to indicate that the PCRC and MEC committees received information that Plaintiff requested a biller and radiology scheduler to delete a study from a medical record.

45.     By letter dated August 3, 2012, Andrews notified Plaintiff that Plaintiff's request for a hearing was granted and that the hearing committee would consist of three medical staff physicians.  Andrews stated that the hearing would take place August 14, 2012.  The hearing, however, was rescheduled and held October 9, 2012.

46.     As further "peer review" discipline, on August 17, 2012, the hospital sent a Clinical Privileges Action Report regarding Plaintiff to the Indiana Professional Licensing Bureau notifying the Indiana Attorney General that the hospital had summarily suspended Plaintiff's clinical privileges to practice medicine at the hospital and attached a copy of the report submitted by the hospital to the National Practitioners Data Bank.

47.     On October 9, 2012, the hospital's peer review hearing committee held a hearing regarding the "peer review" actions taken against Plaintiff on June 26 and July 5, 2012.

48.     On October 22, 2012, Andrews sent Plaintiff a copy of the hearing committee's ruling to confirm the summary suspension of Plaintiff's clinical privileges.

## CORRECTIVE ACTION/SUMMARY SUSPENSION

49.     The hospital's Medical Staff Bylaws provide two distinct procedures for suspension of staff privileges for physicians.  Article VIII, Section I, explains the general procedure for investigation and hearing prior to suspension.  This process applies when the conduct of the targeted physician raises questions of confidence, treatment of patients and conduct believed to be disruptive or detrimental to the operations of the hospital.

50.     The Bylaws make it clear that summary suspension is only proper where there is some emergency or imminent danger to the life, health or safety of a patient in the hospital.  Summary suspension of hospital privileges, Article VIII, Section II, applies:

> "whenever action must be taken immediately in the best of patient care or that the failure to take prompt action may result in imminent danger to the life, health, or safety of any such person in the hospital to suspend summarily all or any portion of the clinician privileges of any medical staff or a

HHP and such summary suspension shall become immediately upon imposition."

51.     The notice of Plaintiff's summary suspension dated June 26, 2012, stated:

"The reason for this summary suspension is your apparent failure to carry out your obligations in a professional, ethical and lawful manner.  On June 11, 2012, a pregnant patient received an OB ultrasound in the Emergency Department. Over the subsequent eight days you were repeatedly asked to dictate a report on the ultrasound.  In response, on two separate occasions you reportedly directed two different hospital staff members to delete or destroy the ultrasound record.  If substantiated, these actions will adversely impact the necessary and fundamental environment of patient safety, quality and ethical standards of conduct."

52.     The hospital repeated these accusations in the hospital's August 2, 2012 report to the National Practitioners Data Bank:

"Dr. Babchuk failed to read a radiology study and dictate a report.  After a period of eight (8) days and multiple requests from hospital staff, the report was read and dictation created. Two hospital staff members reported in hospital event reports that Dr. Babchuk asked them to delete a study from the medical record."

53.     These accusations and the report to the National Practitioners Data Bank were false and each of the individual defendants knew they were false when made.  I.U. Health and the hospital, through the individual Defendants, used "peer review" as a means to rid I.U. Health and the hospital of Plaintiff's contract.

(a)     Defendants told the NPDB that "Dr. Babchuk failed to read a radiology study."  This statement was false when made and Defendants knew it was false.

17

(b)     Defendants represented to the NPDB that "Dr. Babchuk failed to dictate a report."   This statement was false when made and Defendants knew it was false.

(c)     Defendants reported to the NPDB that "two hospital staff members reported in-hospital events reports that Dr. Babchuk asked them to delete a study from the medical record."  This statement was false when made and Defendants did not conduct an investigation to determine otherwise.  Instead, Defendants took the words "make it go away" and unilaterally turned the words into "destroy medical records."

(d)     Defendants told the NPDB that the basis of their action was "Dr. Babchuk's failure to provide medically reasonable and/or necessary items or services."   This statement was false when made and Defendants knew it was false.

54.     Regarding the June 11, 2012 patient, it is undisputed that Plaintiff dictated the final report into the hospital records eight days after the patient was discharged.  It is also undisputed that a medical staff member, such as Plaintiff, is not deemed delinquent in completing patient medical records until "the thirtieth day following discharge of the patient."  Hospital Medical Staff Bylaws Section IX A.  It is undisputed that Plaintiff timely complied with this medical staff obligation.

55.     Andrews, acting as the "peer review committee," requested summary suspension of Plaintiff's clinical privileges at the hospital.  Andrews was also a member

of the PCRC and the MEC.  Harlowe notified Plaintiff of summary suspension on June 26, 2012.  Harlowe is also a member of the PCRC and MEC.  The summary suspension letter was also signed by Pafford as the Chief Medical Officer and as Chairman of the PCRC.  The PCRC and MEC both unanimously voted to continue the summary suspension of Plaintiff's clinical privileges.  The members of the MEC could not have reasonably been expected to maintain an impartial stance in a later proceeding.

56.     Peer review committees are charged with the responsibility to evaluate the merits of complaints made against the medical staff such as Plaintiff.  Evaluation by definition requires an investigation into whether the complained of conduct posed a threat to the health and welfare of the patient seen in the emergency department on June 11, 2012.  No such investigation was conducted.

57.     Defendants' conduct under the guise of "peer review" to impose summary suspension of privileges on the Plaintiff cannot be justified under the facts and circumstances.   There is no evidence that Plaintiff's conduct posed a realistic or recognizable threat to patient care.  In fact, there was no evidence cited by Andrews, Harlowe, Pafford, Scott, Condict, Harper or Young that the prompt action of summary suspension was necessary to prevent imminent danger to the life, health or safety of a patient in the hospital.

58.     It is the existence of such evidence (imminent danger) that justifies the elimination of a pre-suspension investigation and a pre-summary suspension hearing procedure, which is normally afforded members of the medical staff.

59.     The reasons offered by Defendants to justify taking immediate summary suspension action against the Plaintiff do not justify the act.  There is no hospital policy or regulation that requires any medical staff member to complete a dictation on a discharge patient in 8 or less days.  There is no evidence that Plaintiff ordered any person to destroy medical records.  The 2 hospital staff personnel who accused Plaintiff of wanting the record to go away, never testified that Plaintiff told them to destroy medical records.  Those words, "destroy medical records," came from Pafford, Harlowe, Andrews, Scott, Condict, Harper and Young and are attributable to I.U. Health and the hospital.

60.     Furthermore, the NPDB Guidebook, which provides instructions as to when a notice for a summary suspension is to be reported to the National Practitioners Data Bank clearly states, "HHS assumes that hospitals using summary suspensions for the purposes states in Part A of the Act: to protect patients from imminent danger rather than for reasons that warrant routine professional review actions." NPDB Guidebook Page E-20.

61.     Due to the severity of the discipline imposed upon Plaintiff, each of the individual Defendants and the hospital knew that they would have to submit a report of their summary suspension of Plaintiff's clinical privileges to the National Practitioner Data Bank.  Information contained in the report was false.  Defendants knew the information was false when submitted.

## DENIAL OF CONSTITUTIONAL DUE PROCESS

62.     The conduct of Defendants alleged herein dramatically changed Plaintiff's legal status from a physician with a clean license and clinical privileges to a physician that no one will hire.  Defendants recklessly and with malice orchestrated the destruction of Plaintiff's professional reputation and his medical practice before giving Plaintiff a timely and fair hearing to protect his property rights.

63.     Under the hospital's Medical Staff Bylaws, the PCRC was required to assess the information relating to summary suspension, conduct an investigation and make a recommendation to the MEC.  Without giving Plaintiff an opportunity for hearing and without giving the Plaintiff notice of the specific charges against him, the Plaintiff had the burden of convincing the PCRC and later the MEC that the charges against him lacked factual bases.  The MEC and its members put the burden upon Plaintiff of proving his innocence after reportable disciplinary action was already taken against the Plaintiff by the individual defendants cloaking themselves under the guise of "peer review."

64.     The Health Care Quality Improvement Act of 1986 and Indiana Peer Review Act establish criteria for professional discipline of Plaintiff regarding both his hospital privileges and his medical license.   These laws create a protected property interest for Plaintiff in having and maintaining a blemish-free license to practice medicine.  The conduct of all the defendants under the guise of "peer review" took away Plaintiff's protected property interest in his blemish-free license and his clinical privileges to make a living as a physician.

65.     "Summary suspension" is a public statement by I.U. Health, the hospital and each individual Defendant, under the color of law, that Plaintiff lacks medical competency sufficient to clinically practice medicine at the hospital.  The formality of the charge of "summary suspension" enhances the seriousness of the act regardless of its gravity.

66.     Defendants are exercising the power of the state when they summarily suspend a licensed physician from the hospital staff.  The hospital, I.U. Health, Harlowe, Scott, Pafford, Andrews, Condict, Harper and Young engaged in purported professional review activity with respect to Plaintiff when they each determined whether Plaintiff's clinical privileges should be summarily suspended.  The corrective actions recommended and taken by each of these Defendants against the Plaintiff were accomplished outside the scope of "peer review."

67.     The hospital's Medical Staff Bylaws attempt to cloak Defendants' conduct with "peer review committee" authority.  Article VIII, Section II (a).  The hospital's Medical Staff Bylaws specifically state that the hearing procedures are designed to comply with the Health Care Quality Improvement Act of 1986 and the Indiana Peer Review Act.  Article IX.  However, Defendants ignored Plaintiff's rights and, instead, destroyed his career by depriving Plaintiff of constitutional due process.

68.     Plaintiff's privileges to practice radiology at the hospital is a valuable property right protected by the Fourteenth Amendment to the United States Constitution and cannot be taken without just cause and constitutional due process.

69.     A necessary element of due process is that the opportunity to defend must be given at a time when it can be effective.  Unless the defense can speak at a time when there is a chance to be heard fairly, the opportunity to speak is a hollow one, at best.

70.     Plaintiff was not given fair opportunity to defend himself at the time decisions adversely affecting his property rights were made by the hospital, I.U. Health, Pafford, Harlowe, Scott, Andrews, Condict, Harper and Young.  As of June 26, 2012, Defendants had already suspended Plaintiff's privileges, terminated his contract, and cut off Plaintiff's only source of income.

71.     On August 2, 2012, Defendants' submittal of a written report to the National Practitioners Data Bank was a statement to the world that the Plaintiff was an incompetent physician because Plaintiff was summarily suspended from his clinical privileges.  The next day, August 3, 2012, the hospital notified the Plaintiff that his request for a hearing on his summary suspension was granted.  By this time, Plaintiff's due process rights were violated and substantial damages were incurred by the Plaintiff.

72.     The imposition of summary suspension is one of the most extreme and harsh sanctions available to impose under "peer review."  The sanction of summary suspension made by Pafford, , Harlowe, Scott, Andrews, Condict, Harper, Young, the hospital and I.U. Health was made without a reasonable effort on their part to obtain relevant facts and to conduct an actual investigation.

73.     Defendants knew that reporting the sanction of summary suspension to the National Practitioners Data Bank before affording Plaintiff a timely and fair hearing

would destroy Plaintiff's career as a medical doctor. This conduct of Defendants was calculated and timed to ensure the maximum harm would befall Plaintiff.

74.     The nature of the interests protected by Plaintiff's constitutional right to a timely and fair hearing is Plaintiff's livelihood. Peer review is not a license to destroy. Instead, it is an obligation on Defendants to conduct an investigation to evaluate the facts before they summarily suspend privileges, before terminating Plaintiff's service contract, before the PCRC recommends summary suspension, and before the MEC follows suit unanimously recommending summary suspension – even though the draconian sanction has nothing to do with the quality of care rendered to the patient on June 11, 2012.

## DAMAGES

75.     Plaintiff is entitled to compensation for all injuries and damages caused by the deprivation of his constitutional rights to a timely and fair hearing before his hospital privileges were taken and before I.U. Health and the hospital wrongfully terminated his contract. Defendants summarily suspended Plaintiff's privileges before giving Plaintiff notice and the opportunity for a timely and fair hearing. Defendants' conduct caused Plaintiff to lose his only source of income as of June 26, 2012 and his capacity to earn future income. Plaintiff has also suffered severe emotional distress.

76.     The conduct of Defendants was motivated by reckless or callous indifference to Plaintiff's federally protected rights. The degree of reprehensibility of the conduct of I.U. Health, the hospital, Harlowe, Pafford, Scott, Andrews, Condict, Harper and Young rises to the level of evil intent. The harm to Plaintiff that would likely result from I.U. Health's, the hospital's, Harlowe's, Pafford's, Scott's, Andrews', Condict's,

Harper's and Young's conduct in depriving Plaintiff of constitutional due process is substantial.

77.     Defendants' wrongful conduct limits Plaintiff's ability to practice anywhere in the country.  All hospitals are required to consult the National Practitioners Data Bank before credentialing a new physician applicant for medical staff privileges.  Harlowe, Pafford, Scott, Andrews, Condict, Harper, Young, I.U. Health and the hospital knew this at the time they imposed summary suspension of privileges upon Plaintiff.  Defendant knew that the summary suspension of Plaintiff would be reported to the National Practitioners Data Bank and to the Indiana State Licensing Board before Plaintiff would have an opportunity for a timely and fair hearing.  These acts and conduct of each of the individual defendants was reckless and callous and in disregard to the rights of Plaintiff.

78.     The business model of the I.U. Health system is to create an integrated health delivery system.  The principal operating activities of I.U. Health are conducted at its own facilities to implement its business plan through the hospital and I.U. Health's employees at the hospital, Harlowe, the president and CEO.

79.     The hospital is one of I.U. Health's acute care facilities.  I.U. Health's strategic business plan includes the elimination of contracted service providers such as Plaintiff.  The implementation of I.U. Health's business strategy is to consolidate radiology service to I.U. Health controlled subsidiaries through providers employed by its subsidiary hospitals.

80.     I.U. Health, the hospital and Harlowe together with the other Defendants implemented I.U. Health's strategic plan through the wrongful use of economic criteria

unrelated to quality of care or professional competence in determining Plaintiff's qualifications to continue with his hospital medical staff privileges.  Defendants used the patient incident of June 11, 2012 as a pretext to summarily suspend Plaintiff's hospital medical staff privileges, rid the hospital of Plaintiff's contract and implement the I.U. Health policy of economic credentialing.

81.   Defendants' conduct has irrevocably damaged the professional reputation of Plaintiff and caused Plaintiff severe emotional distress.

82.   Plaintiff is owed compensation under the terms of his service agreement with the hospital including annual renewals.  Plaintiff intended to continue practicing and providing clinical services at the hospital for another ten years.  Plaintiff also incurred loss of medical malpractice coverage, health insurance, and other benefits derived from his hospital clinical privileges.  Plaintiff's damages for lost income alone are not less than $12,500,000 plus pre-judgment interest.

**WHEREFORE**, Plaintiffs requests the court to enter Judgment in favor of the Plaintiffs and against Defendants as follows:

A.   Award Plaintiff all of his damages caused by Defendants for the deprivation of Plaintiff's constitutional right to a timely and fair hearing before his hospital privileges were taken and before Defendants blemished his clean medical license.

B.   The conduct of each of the individual Defendants was motivated by reckless or callous indifference to Plaintiff's federally protected rights.  Accordingly, the

Plaintiff is entitled to an award of punitive damages against each of the individual defendants and the hospital.

C.      Award Plaintiff the compensation for loss of his radiology service agreement with the hospital and for Plaintiff's loss of earning capacity.  The amount of loss is not less than $12,500,000 plus pre-judgment interest.

D.      Award Plaintiff damages for his emotional distress caused by Defendants' wrongful conduct.

E.      Award Plaintiff all of his attorneys' fees, costs and expenses incurred in preparing, maintaining and pursing this lawsuit and for such other and further relief as the court deems just and proper.  Costs, fees and expenses should be awarded under 42 U.S.C. § 1988 and pursuant to contract.

F.      Award Plaintiffs such other relief as the Court deems just.

Respectfully submitted this 28th day of August 2013.

CLARK HILL PLC

_____
Aaron O. Matthews  IN-23062-53
212 East Grand River
Lansing, MI  48906
517-318-3018
amatthews@clarkhill.com


_____
Gregory W. Moore, IN-15796-49
151 S. Old Woodward Avenue, Suite 200
Birmingham, MI 48009
gmoore@clarkhill.com
Phone: (248) 988-5842
Fax:    (248) 998-2514
**ATTORNEYS FOR PLAINTIFFS**

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs, by and through their counsel, hereby demand a trial by jury of the above entitled matter.

CLARK HILL PLC

s/Aaron O. Matthews
Aaron O. Matthews  IN-23062-53
212 East Grand River
Lansing, MI  48906
517-318-3018
amatthews@clarkhill.com

s/ Gregory W. Moore
Gregory W. Moore, IN-15796-49
151 S. Old Woodward Avenue,
Suite 200
Birmingham, MI 48009
gmoore@clarkhill.com
Phone: (248) 988-5842
Fax:    (248) 998-2514

**ATTORNEYS FOR PLAINTIFFS**