UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM I. BABCHUK, M.D. and<br>WILLIAM I. BABCHUK, M.D., P.C.<br>doing business as COMPREHENSIVE<br>MEDICAL IMAGING,<br>　　　　　　　　　Plaintiffs,<br><br>　　　vs.<br><br>INDIANA UNIVERSITY HEALTH,<br>INC., INDIANA UNIVERSITY HEALTH<br>TIPTON HOSPITAL, INC.,<br>MICHAEL L. HARLOWE,<br>JOELLEN SCOTT,<br>CARL M. PAFFORD,<br>DIANNA ANDREWS,<br>KEVIN W. CONDICT,<br>MICHAEL E. HARPER, and<br>RICHARD J. YOUNG,<br>　　　　　　　　　Defendants. | Case No. 1:13-cv-01376-JMS-DML |

## Order on Plaintiffs' Motion to Compel Production of Documents

Before the court is a motion by plaintiffs, Dr. William Babchuk and the corporate entity through which he practices medicine (together, "Dr. Babchuk"), to compel the defendants to produce certain documents and "further and fully respond" to Dr. Babchuk's second document requests. (Dkt. 82). For the reasons stated below, the motion is DENIED. Under the court's order dated September 22, 2014 (Dkt. 80), Dr. Babchuk's response to the defendants' motion for summary judgment is due within 30 days of the entry of this order.

## Background

Dr. Babchuk's complaint alleges that the defendants violated his right to due process under the Fourteenth Amendment in connection with the termination of his clinical privileges at defendant IU Health Tipton Hospital (the "Tipton Hospital") on June 26, 2012. The termination of his clinical privileges led to the termination of a contract his medical practice had with the Tipton Hospital to provide radiology services and led to reports of his suspension being made to the National Practitioner Data Bank and to the Office of the Indiana Attorney General Licensing Enforcement Unit. The other defendants are Indiana University Health, Inc. ("IU Health Corporation"), which is alleged to own the Tipton Hospital, and seven individuals alleged to have participated in some way in the decision process that culminated in the termination of Dr. Babchuk's clinical privileges. (*See* Complaint, Dkt. 1).

Dr. Babchuk seeks relief under 42 U.S.C. § 1983, which provides a civil remedy against a person who, under color of law, violates another's federal constitutional rights. The Fourteenth Amendment applies only to state actors, and not to conduct by private actors, but under some circumstances conduct by private actors can be characterized as state action for purposes of a constitutional claim via section 1983. *E.g., Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 295 (2001); *Hallinan v. Fraternal Order of Police,* 570 F.3d 811, 815 (7th Cir. 2009). The defendants consistently have asserted that the section 1983 claims fail because they are not state actors and therefore could not have violated

the Fourteenth Amendment. They first raised this argument in a Rule 12(b)(1) motion to dismiss, which the district court denied because the absence of state action does not deprive the court of subject matter jurisdiction to decide this case; rather, state action is an element of the plaintiffs' cause of action. (*See* Dkt. 50). The court also ruled that the state action issue would not be decided in the context of a Rule 12(b)(6) motion to dismiss but must be raised, if before trial, by summary judgment motion. (*Id.*).

The magistrate judge held a conference with the parties and ordered that the defendants could bring an early motion for summary judgment directed at the state action element, and set a status conference for the parties to address any discovery necessary to complete briefing of such a motion. At that status conference, held on June 23, 2014, Dr. Babchuk was directed to serve written discovery relevant to the state action issues by June 30, and the parties were required to address the depositions needed by Dr. Babchuk before responding to the defendants' summary judgment motion, which they had filed on June 19, 2014. The court heard nothing from the parties regarding discovery disputes a month after the defendants' written responses would have been due and set a date certain (September 26, 2014) for Dr. Babchuk's summary judgment response. Only when that deadline was about to expire was the court advised—by an email—of discovery disputes. (*See* Dkt. 81). The court directed Dr. Babchuk to file a motion to compel. He did so on October 6, 2014; the motion is fully briefed and before the court for resolution.

3

## Analysis

The heart of the discovery dispute between the parties concerns whether the defendants are required to produce additional documents regarding their relationships with Indiana University, a state institution. Dr. Babchuk frames that issue by asking the court to overrule a "nexus" objection interposed by the defendants. In response to many of Dr. Babchuk's second discovery requests, the defendants objected that the "request is not limited in time and has no nexus to the challenged 2012 decision regarding Babchuk." The court will first address this issue. It will then reach Dr. Babchuk's other complaints about certain general objections and alleged boilerplate objections, and about the defendants' compliance with Rule 26(b)(5) to provide a privilege log.

### I. General Discovery Principles

Rule 26(b)(1) provides that parties may obtain discovery regarding any matter relevant to a claim or defense, yet the court must also limit the extent of discovery otherwise allowable where, for example, the burden or expense of providing it outweighs its likely benefit, "considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Rule 26(b)(2)(C)(iii). *See also Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 681 (7th Cir. 2002) (internal citations omitted) (although strong public policy favors disclosure of relevant materials, court should weigh "the value of the material sought against the burden of providing it and taking into society's interest in

furthering the truthseeking function in the particular case before the court"). To apply these basic discovery principles, the court must necessarily review the legal claim at issue for which discovery is sought. The court does so not to express a view on the state action question in this case, but rather to explore the scope of discovery pertinent to the issue as presented in this case.

## II. State Action and "Nexus"

The discovery issue before the court asks whether the defendants have failed to produce documents Dr. Babchuk is entitled to discover to support his allegation that the termination of his clinical privileges was the result of state action. Tipton Hospital and IU Hospital Corporation (and the individual defendants alleged to have acted in capacities as employees of these entities) are not Indiana state agencies, but the ambit of the Fourteenth Amendment extends beyond a state and formal government organizations. It does so "'when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.'" *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 295 (2001) (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982) (emphasis in original)). "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Academy,* 531 U.S. at 295 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974)).

As explained in *Brentwood Academy,* "a host of facts . . . can bear on the fairness of such an attribution," and no single fact is always required for finding

5

state action and no set of circumstances can be said to be "absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Id.* The range of circumstances where state action may be found have included when a challenged action "results from the State's exercise of 'coercive power,' when the State provides 'significant encouragement, either overt or covert,' or when a private actor operates as a 'willful participant in joint activity with the State or its agents.'" *Id.* at 296 (internal citations omitted). A private entity may be a state actor also when "it is controlled by an 'agency of the State,' has been delegated a public function by the State, is 'entwined with government policies,' or when government is 'entwined in [its] management or control.'" *Id.* (internal citations omitted). In *Brentwood Academy,* the Court found that a nominally private entity was "overborne by the pervasive entwinement of public institutions and public officials in its composition and workings" so that it was not unfair to apply constitutional standards. *Id.* at 298.

One of Dr. Babchuk's state action theories is the "pervasive entwinement" explored in *Brentwood,* so it is useful to review the facts of that case. *Brentwood Academy* concerned the 1997 enforcement of a regulation concerning athlete recruitment adopted by the Tennessee Secondary School Athletic Association ("Association") against a private parochial high school. The Association regulated interscholastic sports among the public and private high schools that were members of the Association, including Brentwood Academy. The Association's history revealed its close ties to the State of Tennessee. At its incorporation in 1925, the

6

Tennessee State Board of Education had recognized the Association's role in enacting and enforcing rules and regulations for athletic competition among the "public schools of Tennessee." *Id*. at 292. Later, in 1972, the State Board had by rule even "designated" the Association to regulate athletic activities among Tennessee public schools and specifically approved its regulations while retaining the authority to review any changes to regulations. Over the next 20 years, the State Board had on several occasions "reviewed, approved, or reaffirmed" the very Association regulation that was being challenged in the litigation by Brentwood Academy. *Id*. In 1996, the State Board—after a lawsuit in which the Association was found to be a state actor in a Section 1983 case—amended its rule that had designated the Association as the regulator of high school sports and characterized the Association as a purely voluntary association coordinating high school athletics for schools that chose to participate as members.

Despite the Association's 1996 "break" with the State Board, the Court found that because the Association continued to be pervasively entwined with the Tennessee public school system from the "bottom up" and the "top down," the Association "ought to be charged with a public character and judged by constitutional standards" with respect to its 1997 regulatory enforcement proceeding against Brentwood Academy. *Id*. at 302. The entwinement included the facts that (a) the very regulation at issue had been reviewed and approved by the State Board; (b) the State Board permitted students to satisfy the State physical education requirement by participating in sports sponsored by the Association;

7

(c) the "customs and practices" of the Association had not changed despite the 1996 "break" with the State Board; (d) members of the State Board were nonvoting member-designees on the Association's board of control and legislative council; (e) employees of the Association were entitled to participate in the State's retirement system; and (f) 84% of the Association's membership were public schools, "represented by their officials acting in their official capacity to provide an integral element of secondary public schooling." *See id.* at 299-301.

With this backdrop in mind, the court turns to the specific discovery dispute at hand. First, it is clear from *Brentwood Academy* that there indeed must be some tie or "nexus" between the challenged conduct and the government, even if that nexus is an overwhelming "top to bottom" pervasive entwinement of government in the workings of the nominally private actor. The defendants' objection, therefore, to producing documents and information without a sufficient nexus to the challenged 2012 decision terminating Dr. Babchuk's clinical privileges will be sustained. Instead, the issue is whether the documents and information that the defendants have already provided in discovery to Dr. Babchuk fairly permit him to explore his nexus theories, including a theory that the 2012 termination of his clinical privileges can be attributable as conduct of the State because of a pervasive entwinement of Indiana University and its School of Medicine with IU Health Corporation and, in turn, the workings of Tipton Hospital.

Dr. Babchuk's motion to compel provides virtually no explanation of how the documents he seeks are reasonably necessary to support his nexus theories or why

8

the documents that have been produced are insufficient.  His opening memorandum specifically mentions the contents of eight document requests and generally describes them as seeking (1) strategic or business plans of IU Health Corporation and Tipton Hospital (Document Request 1), (2) "documents which concern the flow of benefits to Indiana University School of Medicine and to Indiana University generally, and the control of Defendants by the Trustees of the Indiana University and by representatives of the School of Medicine" (Document Requests 8, 9, 10, 11, 12, and 13), and (3) communications between Defendants and any IU Trustee related to the management or operations of IU Health Corporation or Tipton Hospital or related to staffing and/or privileging of physicians." (Document Request 7).  *See* Dkt. 83 at pp. 6 and 13).  Dr. Babchuk does not acknowledge, however, the scope of documents he has been provided documenting the finances and management of IU Health Corporation and Tipton Hospital.

His reply memorandum does not address at all the defendants' arguments regarding the extensive documents they have provided detailing the inter-relationships between Tipton Hospital, IU Health Corporation, Indiana University, and the School of Medicine.  The defendants' response brief discussed in detail the scope of documents they produced in response to document requests 1, 7, 8, 9, 10, 11, 12, and 13, and explained—persuasively—why, in light of the extent of those documents, any marginal relevance of any additional documentation is outweighed by the burden of producing more.

Dr. Babchuk has received:

- IU Health Corporation's and Tipton's Hospital's articles and by-laws.
- IU Health Corporation's and Tipton Hospital's complete files regarding IU Health Corporation's acquisition of Tipton Hospital from Tipton County, which became effective in 2009.
- Tipton Hospital's operating and capital budgets for 2009-2013.
- The agreements, and amendments thereto, creating IU Health Corporation, and documenting its structure and management, and relationship to Indiana University and the IU School of Medicine.
- Audited financials for IU Health Corporation, and which detail the extent of financial transactions between IU Health Corporation and the IU School of Medicine.
- Financial information regarding payments connected to Indiana's state Medicaid program.
- Leases and subleases for property on which various IU Health facilities are located.
- The documents surrounding the termination of Dr. Babchuk's clinical privileges and the complete peer review file.

The defendants provided cogent argument why drilling deeper into financial details or management reporting is burdensome in light of the documents and information already provided. Dr. Babchuk's failure to address the defendants' arguments head-on and with specifics is telling. It is not enough to say that

financial and management information can be relevant to a pervasive entanglement nexus theory. Dr. Babchuk needed to explain why, even with the information he has been provided regarding the management, structure, workings, and finances of both Tipton Hospital and IU Health Corporation, there are gaps that prevent him from presenting a fair picture of the relationships between the State and Tipton Hospital.

For example, Dr. Babchuk does not explain why he needs detailed records of payments from IU Health Corporation to the IU School of Medicine when he has been provided the audited financial statements for IU Health Corporation (and the Definitive Agreement creating IU Health Corporation), which document and describe the direct and indirect financial support flowing from IU Health Corporation to the School of Medicine. He provides no hint about what can be gained through a production of more detail about payments. Similarly, Dr. Babchuk does not explain why he needs to review every document and communication between and among IU Health Corporation, Tipton Hospital, any of the individual defendants and the IU Trustees, years of management reports, or highly confidential strategic business plans when he has been provided the documents describing and governing the corporate and management structure of both IU Health Corporation and Tipton Hospital, the relationships between them, and their relationships with Indiana University. There is no suggestion of a secret, underground management system operating outside the corporate by-laws, articles, and agreements that have been produced.

11

The court concludes that given the breadth of documents and information already provided to Dr. Babchuk, it is not reasonable to require the defendants to do more. The court is convinced that Dr. Babchuk has the documents reasonably necessary for him to trace the ways in which, at or around or leading up to the time of the termination of his privileges in 2012, Tipton Hospital and IU Health Corporation were intertwined in structure, management, and finance with each other, Indiana University, and state government.

### III. General Objections, "Boilerplate," and Privilege Claims

The court also rejects Dr. Babchuk's requests for relief related to the defendants' general objections, alleged boilerplate objections, and privilege assertions. He does not suggest that any documents or information have been wrongfully withheld based on the general or "boilerplate" objections, and apparently accepts (as does the court) the defendants' representations that discovery has not been withheld based on those objections. Without a concrete dispute affecting the fund of information available to Dr. Babchuk for addressing the summary judgment issues, the court declines to order relief.

The court also rejects Dr. Babchuk's contention that the defendants have not provided an appropriate privilege log. According to the defendants, they have identified and logged any documents specifically withheld on attorney-client privilege or work product grounds. Other than the "nexus" dispute, Dr. Babchuk makes no specific challenge to the withholding of these documents, and the court

12

will not require the defendants to log documents within categories that it has agreed the defendants are not required to produce.

## Conclusion

The plaintiffs' motion to compel (Dkt. 82) is DENIED. Their response to the defendants' motion for summary judgment must be filed within 30 days of the date of the entry of this order.

So ORDERED.

Date: December 17, 2014

_Debra McVicker Lynch_
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system